JPL:AAS
F.#2011R01835

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JAMIL AHMED,
    also known as
    "Chawdry," and
MUHAMMAD NASIR RAFIQUE,
    also known as "Raju,"

        Defendants.

- - - - - - - - - - - - - - - - -X

M__-0337

**TO BE FILED UNDER SEAL**

C O M P L A I N T

(18 U.S.C. § 1028(f))

EASTERN DISTRICT OF NEW YORK, SS:

    TENZIN ATSATSANG, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between December 1, 2010 and February 14, 2012, within the Eastern District of New York and elsewhere, the defendants JAMIL AHMED, also known as "Chawdry," and MUHAMMAD NASIR RAFIQUE, also known as "Raju," did knowingly and intentionally conspire to produce without lawful authority one or more false identification documents in a manner affecting interstate commerce.

    (Title 18, United States Code, Sections 1028(f), 1028(b)(2)(A), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent of the FBI, duly appointed according to law and acting as such. I have been a Special Agent for approximately 6 years.

2. During my tenure with the FBI, I have participated in numerous investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants; (c) reviewed and analyzed numerous taped conversations and records; (d) debriefed cooperating terrorists and individuals; (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals.

A. Introduction

3. Since the summer of 2011, the FBI has been investigating an international passport fraud ring (the "Organization") operating in Pakistan, the United States, and elsewhere. The Organization manufactures high-quality counterfeit identity documents, such as international passports, driver's licenses, and U.S. work permits, that feature accurate reproductions of official holograms, stitching, and seals. The investigation has revealed that, in connection with its

---

[1] The information set forth below is based upon my personal involvement in this investigation, as well as conversations with other law enforcement officers and my review of records and reports. In addition, because this affidavit is being submitted for the limited purpose of establishing probable cause to charge, I have not set forth every fact learned during the course of this investigation.

2

counterfeit identity documents operations, the Organization helps facilitate the illegal entry into the United States and Canada of numerous undocumented aliens from Pakistan and elsewhere.

4. The defendant JAMIL AHMED, also known as "Chawdry," is a principal of the Organization who arranges for the production of and delivery of counterfeit identity documents to the Organization's clients (the "Clients").

5. The defendant MOHAMMAD NASIR RAFIQUE, also known as "Raju," is a Client who, on at least one occasion, recruited another prospective Client on behalf of the Organization.

B. Detention of RAFIQUE

6. On or about December 10, 2010, the defendant MUHAMMAD NASIR RAFIQUE was detained by U.S. immigration officials as he attempted to enter Canada aboard an Amtrak train at Rouses Point, New York. At the time of his arrest, RAFIQUE was in possession of a fraudulent United Kingdom passport and fraudulent Department of Homeland Security I-94 entry documents into the United States. After waiving his Miranda rights, RAFIQUE admitted that he had purchased the counterfeit passport and entry documents from "Chawdry" for approximately $5,400. "Chawdry" is a known alias of defendant JAMIL AHMED. Notably, the fraudulent United Kingdom passport featured authentic-appearing holograms, stitching, and sealing, as well as exit and entry stamps from Pakistan and the United States. Following his arrest, RAFIQUE was permitted to make one telephone call. RAFIQUE called the

verified number for AHMED's brother, whom the investigation has identified as a member of the Organization.

7. On January 21, 2011, the defendant MOHAMMAD NASIR RAFIQUE pleaded guilty to false use of a passport, in violation of 18 U.S.C. § 1543 in the United States District Court for the Northern District of New York. On March 9, 2011, RAFIQUE was sentenced to time served and two years of supervised release, and was released into immigration custody. One of the conditions of his supervised release was that he not "associate with any persons engaged in criminal activity." On April 7, 2011, RAFIQUE's roommate (the "Roommate") posted $10,000 to secure RAFIQUE's release from immigration custody. Notably, on April 12, 2011, there were three telephone calls totaling over 37 minutes between the cellular telephone associated with RAFIQUE and a Pakistani telephone number associated with AHMED.

C. Meeting With AHMED

8. During May 2011, a confidential source (the "CS"), who has provided reliable information, met with the defendant MOHAMMAD NASIR RAFIQUE in Queens.[2] According to the CS, during the May 2011 meeting, RAFIQUE admitted that the defendant JAMIL AHMED had prepared the fraudulent travel documents seized from RAFIQUE at the time of his December 2010 arrest and that, in approximately 2002, AHMED had helped facilitate RAFIQUE's illegal

---

[2] The CS had met RAFIQUE several years earlier when RAFIQUE resided in New York City. At the time of the May 2011 meeting, the CS was not yet cooperating with law enforcement authorities.

4

entry into the United States, also through the use of fraudulent travel documents. RAFIQUE further informed the CS that AHMED had posted a bond, through the Roommate, to secure RAFIQUE's release from immigration custody.

9. According to the CS, after hearing the CS express interest in traveling to Canada, the defendant MOHAMMAD NASIR RAFIQUE brought the CS to meet with the defendant JAMIL AHMED at a public park in Ozone Park (the "Park Meeting"). This meeting occurred in approximately late May 2011. In return for introducing the CS to AHMED, RAFIQUE asked the CS for his New York City Taxi Operators License (the "Operator License"). During the Park Meeting, AHMED stated that he had successfully arranged the entry of many illegal aliens from the United States into Canada, through the use of false travel documents, and discussed the potential sale of fraudulent identity documents to the CS. The Park Meeting between AHMED, RAFIQUE, and the CS is corroborated by toll records showing frequent contact during May 2011 between the telephones of AHMED, RAFIQUE, and the CS. For example, on May 25, 2011, there were eleven calls between the telephone numbers associated with AHMED and RAFIQUE and five calls between the telephone numbers associated with RAFIQUE and the CS. Many of these calls occurred minutes apart from each other.

    C.    <u>Purchase of Fraudulent Identity Documents</u>

10. Several weeks after meeting with the defendant JAMIL AHMED, the CS began to cooperate with law enforcement

authorities and participated in consensually-monitored meetings and telephone conversations with AHMED.

11. For example, in August 2011, the CS met with the defendant JAMIL AHMED while acting under the supervision of agents. During the conversation, which was recorded, AHMED discussed providing a counterfeit British passport and driver's license to the CS, in return for $11,500. During the same conversation, AHMED discussed how he and other members of the Organization would prepare the CS to learn about the CS's purported British identity. In particular, AHMED stated that a member of the Organization would call the CS "for half an hour to 15 to 20 minutes to prepare you . . . [a]bout England." AHMED also admitted that the Organization operates in alien smuggling ("I told you that give us people, male, female or couples husband and wife, married couple and we'll bring them here within fifteen days."). Finally, AHMED and the CS discussed the December 2010 arrest of RAFIQUE and the successful entry of a female alien ("FNU LNU") from the United States into Canada. AHMED stated that both RAFIQUE and FNU LNU had used fraudulent travel documents and suggested that these fraudulent travel documents were prepared by the Organization.

12. During November 2011, the CS participated in a telephonic conversation with the defendant JAMIL AHMED, who was using a Pakistani number.[3] This call was recorded. During the

---

[3] Immigration records reveal that AHMED departed the United States for Pakistan on September 20, 2011.

6

conversation, AHMED directed the CS to meet with a co-conspirator ("CC1"), who, according to AHMED, would be using the same phone previously used by AHMED (the "SUBJECT TELEPHONE").

13.  On the same date, the CS met with CC1 at a prearranged meeting location in Queens, New York.  Agents had provided $11,500 in U.S. currency to the CS, who was wearing an audio-video recorder.  During the meeting, CC1 was speaking on a cellular telephone and informed the CS that CC1 was speaking with the defendant JAMIL AHMED.  CC1 then handed CC1's cellular telephone to the CS, so that the CS could speak with AHMED.  After the CS received the cellular telephone, AHMED instructed the CS to provide payment to CC1.  The CS then provided $11,500 to CC1.  At the conclusion of the meeting, CC1 directed the CS to contact AHMED for further instructions.  Toll records for the SUBJECT TELEPHONE reflect multiple calls with a Pakistani number at or around the time of the meeting between the CS and CC1.

14.  Between November 2011 and February 12, 2012, the CS participated in numerous consensually-monitored phone calls with the defendant JAMIL AHMED in which AHMED promised to provide a fraudulent passport and driver's license.  Additionally, AHMED informed the CS that he had "assigned someone your work and that person will call you himself."  Based on my training, experience, and knowledge of this investigation, I believe that AHMED promised that a member of the Organization ("CC2") would be contacting the CS to coach him/her as to his/her fraudulent British identity.

15. Subsequently, the CS participated in multiple consensually-monitored phone calls with CC2, who used a Pakistani-number. For example, on November 19, 2011, the CS spoke with CC2, who stated, "Write this down, your name is 'Pervaiz Chohan.'" During the same telephone call, CC2 also provided information regarding the assumed identity, such as the CS's purported date of birth, place of birth, address, employer, business address, home telephone number, mobile telephone number, work telephone number, salary, nature of employment, purpose of visit to the United States, and place of entry into the United States. CC2 also instructed the CS regarding the color of local taxicabs in London, the names of local roads in London, and the length of flight from Heathrow International Airport to New York.

16. During a series of telephone conversations in February 2012, the defendant JAMIL AHMED directed the CS to purchase a one-way airplane ticket from LaGuardia Airport in New York City to Toronto, Canada departing on February 13, 2012. According to AHMED's instructions, the CS was to meet a courier carrying the fraudulent identity documents at a prearranged meeting location in Queens. AHMED also instructed the CS how to respond to questioning from immigration officials. For example, during a call on February 10, 2012, AHMED stated, "You have to show that you came from England to America and stayed here for fifteen, twenty days. Then someone gave you the documents. Don't say that you've been here for ten, eleven years." During the same call, AHMED stated, "They can question you for 15, 20

minutes but if you are there for one to two hours, that means you are caught. That's when you ask them for asylum because you have this problem in Pakistan. You should have a story about that in your mind already." Additionally, AHMED instructed the CS to provide the CS's cellular telephone to the courier, in return for the fraudulent identity documents.

17. On February 13, 2012 at the prearranged meeting location in Queens, the CS met with a courier ("CC3") and provided the CS's cellular telephone. CC3 then provided the CS with a fraudulent British passport, driver's license, Department of Homeland Security I-94 entry documents, and travel itinerary. All documentation was in the name "Pervaiz Chohan." Notably, the United Kingdom passport features authentic-appearing holograms, stitching, and sealing, as well as exit and entry stamps from Pakistan and the United States. Additionally, the United Kingdom driver's license bears the latest design as well as authentic-appearing holograms.

18. On February 14, 2012, while acting at the direction of law enforcement, the CS called the defendant JAMIL AHMED and claimed to have entered Canada and to have sought asylum. During the call, which was recorded, AHMED congratulated the CS on arriving in Canada. AHMED also asked the CS what the CS had been asked "at the immigration counter" so that the Organization could "help . . . prepare others properly in the future." During the same call, AHMED asked whether immigration

9

authorities had seized the passport or whether he had "ripped the papers."

WHEREFORE, it is requested that the defendants JAMIL AHMED and MUHAMMAD NASIR RAFIQUE be dealt with according to law.

_____
Tenzin Assatsang
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of April, 2012
_____

AK
GE